SPRADDLING & KEETON, APPELLANTS, VS. PIPKIN, RESPONDANT.

1. It is a settled rule of law, that the administration of all the goods of an intestate, wherever
   situated or found, is to be made according to the law of his domicil. When they are in a
   different country, they are first applied, under the laws of that country, to the satisfaction
   of the claims of creditors who establish their claims under its laws; and if there are any
   of its citizens, who claim as distributees, distribution of the assets will be made there
   But, after the claims of creditors are satisfied, and when the distributees reside in the
   country of the intestates domicil, or there are other creditors there, whose claims remain
   unsatisfied, the tribunals of the country, in which the assets are found, will direct them to
   be remitted to the country of the.domicil, for further administration.

2. In determining whether assets of a deceased person shall be transferred from this State, the
   the first thing to  be ascertained is, where did  the intestate have his domicil?   In what-
   ever State that may have been, the administration granted there is the principal one, and
   that, in any other State, is ancillary, and priority in administration has no effect on this
   question.

3. Where the record shows a case, in which the transfer of assets  would have been ordered
   if such order had been applied for, the act of the administrator, in making the transfer,
   completed the administration here, and vested the title  to the assets in the foreign admin-
   istrator, so that an administrator de bonis non appointed here, cannot claim them as the
   property of the deceased, unadministered by the former administrator here.

4. Where a foreign administrator fraudulently converts assets transferred to him, and brings
   them here, the proper method of reaching the merits of the  case, is not on  an action of
   detinue by an administrator de bonis non appointed here—but a bill in equity.

5. If the domicil of an intestate, at the time of his death, was in a  foreign State; if adminis-
   tration upon his estate here has been finally closed, by the satisfaction of all  demands
   exhibited,  and the residue of the assets transferred and carried into the foreign adminis-
   tration,  an administrator de bonis non appointed here, cannot recover them, though
   brought again into this State.

Spraddling & Keeton vs. Pipkin,

## APPEAL from Jefferson Circuit Court.

JOHNSON, for appellants, insists:

1. That the county court of Jefferson county had no right to order Pipkin, the public administrator of that county, to administer on the slaves in question, and that he had no right to sue for them. The slaves of John Keeton were inventoried by Wm. Keeton, the administrator, in 1827. It not being necessary to retain these slaves in Missouri to pay debts, and the heirs desiring it, and the rule for distribution being the same in Missouri and Tennessee, they were transmitted to the latter State, hired out, and their hire returned to the Probate Court, and, in fact, administered on there. Wm. Keeton made a final settlement in Missouri, on 27th of November, 1830. That Missouri lost jurisdiction over the slaves in 1827, and Tennessee acquired jurisdiction. Both States could not have jurisdiction over the same property at the same time. Missouri having lost her jurisdiction, and the administration having been closed, by final settlement, her courts could never make orders that would vest the title to the slaves in any subsequent administrator. It is impossible for a court to require the same property to be administered upon twice.

2. The order of the county court required Pipkin to take charge of the goods and chattels of John Keeton, *unadministered;* and under this order he sues for slaves that had been administered on, 18 years before. He goes beyond the order and violates its very terms. He sues the representative of the first administrator, when that administrator had made final settlement of the estate in 1830. Where final settlement is made, the administrator is out of court, as to all the property included in his inventories. Who would be an administrator, if, 18 years after final settlement, the court had a right to order a new administration on the property included in his inventories, and have his children harrassed by suits when he is dead and gone, and, perhaps, when many of the evidences of his administration may be lost or destroyed?

3. Wm. Keeton, having made a final settlement in Missouri in 1830, it is necessary to set aside that settlement as fraudulent, otherwise it operates as an effectual bar to the claims here advanced. This point is decided in a kindred case from the same county that this comes from. Robt. Keeton et al. vs. Wm. Spraddling et al. 13 Mo. Rep. p. 323. This has not been done and cannot be done. It was never even tried.

4. The circuit court erred in giving the five instructions, at the instance of the plaintiff. "That there is no evidence before the jury that the slaves have been administered upon, and the titles of John Keeton's heirs divested under the letters granted in Jefferson county. It is wrong, because it is telling the jury that there is no evidence of the fact, when, in truth, the fact is clearly established. And besides, though the fact may not be clearly established, the court has no right to tell the jury that there is *no evidence* of a fact if there is *any evidence of it.* If the opposite be the law, the court would usurp the province of the jury. See Mo. Rep. possim. In the first instruction given at the instance of the plaintiff, the court leaves it to the jury to find the fact whether the slaves were administered on or not. This was proper. It then turns round in the 5th instance, and tells the jury that there is no evidence that they were administered upon. In the two instructions taken together, the jury are, in effect, told to find for the plaintiff. Of course they disregarded any evidence offered by defendant.

5. If these reasons be correct, the circuit court should have given instructions Nos. 1 and 3, asked by defendant, and in refusing them it committed error.

6. The 1st and 4th instruction voluntarily given by the court to the jury are repugnant and irreconcilable and could not fail to mislead. It tells them, in the 1st that if the sale is void, no circumstances of acquiescence by the heirs or the receiving of their distributive shares can make the sale binding, and yet, though the sale be void, such circumstances, if Wm. Keeton purchased for himself and held as his own, will make an adverse possession, which will complete his title

after five years. To say that a title can never be valid, and in the next breath, that it will be valid in five years, is a solecism.

7. In the third instruction voluntarily given by the court, it tells the jury, "if they find that the title to the slaves in controversy, never legally passed to Wm. Keeton, in his own right, &c." Here the court commit an opposite error to the one just complained of. It does not usurp the province of the jury, but tells the jury to usurp the province of the court. It submits a question of law to the jury. Whether the title ever legally passed, is a matter for the court to decide, basing its decision upon the facts admitted or found by the jury. Ad questiones facti juratores respondunt, ad questiones legis judices respondunt. Such instructions have often been condemned by this court.

8. The circuit court should not have rejected the bill of sale of Wm. Keeton, administrator, to Elizabeth Keeton. It could not have been regarded in the light of evidence made for the occasion. It was found among his papers by his administrator ante litem motam. It bore date, April 9th, 1832, and its execution was both admitted and proved. The fact of there being two subscribing witnesses, shows that it must have been executed at the time it bore date. The paper came from the proper custody. It was the first link in Wm. Keeton's title. It is very common, when a purchase of property is made, to turn over to the last purchaser all the prior conveyances. If A., as administrator, sells lands to B., and makes a conveyance, and A. should afterwards buy all or a portion of the same land from B., and be put to sue for possession, would his deed, as administrator be rejected, when offered as the first link in his chain of title, upon the ground that the deed did not come from the proper custody? I think not. The question of "proper custody" is only important in the event that suspicion is thrown upon the genuineness of a paper; it helps to prove its authenticity. Here no suspicion surrounds the deed; it is both admitted and proved to be genuine.

9. There are several instructions given and several refused, which bear upon the validity of the sale made by Wm. Keeton in Tennessee. In the 6th point made, we showed two instructions given, which are entirely repugnant to each other. Instruction No. 19, asked by defendant, was refused, which embodied defendant's view. In this conflict, this court must say what the sale amounts to. We throw out of view the orders of any court, and say, that for payment of debts, the administrator has a right to sell slaves without the order of court, and his sale will confer a good title on the purchaser. For this purpose it has often been held valid in this State; and we say, secondly, that where property is transmitted from one jurisdiction to another, the administrator has a right to distribute it among those entitled, without the aid of a court: New England, Story's Coupl. of Law, p. ——. The record shows, that the sale was necessary for payment of debts and distribution.

10. Should this be questioned, there is no doubt that the heirs might consent that the administrator should sell slaves for the two purposes indicated, without going into courts at all, and such consent would forever estop them from disputing the sale. The record shows that all the adult heirs and Elizabeth Keeton, in her own right and as guardian of her three minor children, did consent to the sale. Numerous witnesses proved that the heirs consented to the sale, that they were present thereat and never objected to it at the time nor since. We are aware that consent cannot give jurisdiction. We do not rely at all upon the court of pleas and quarter sessions. We rely upon the naked consent of the heirs, given to Wm. Keeton, in court and out of court. Take this case for illustration, — A. holds the legal title to a piece of land for the benefit of B. C. and D.; there is $50 00 due on the purchase money, which is a lien upon it in A.'s hands. B., C. and D. get together and consent that A. shall sell the land, make a deed, pay the $50 00 and divide the balance of the money among them. They all then go into the county court, which has no jurisdiction, to order the partition of lands, and get the court to enter an order, by consent, that A. shall sell the land, pay the balance of the purchase money and distribute the residue of the proceeds of sale, among those entitled. Now while the order of the county court is a nullity, it does not invalidate the consent of B., C. and D., given to A. to sell, both out of court and in court. The order of the county court, while invalid as an order, is yet evidence of the bona fides of the transaction. And, moreover, in this case, Wm. Keeton paid over to each heir

his equal distributive share, and procured their receipts in full. It is not pretended that these receipts were procured unfairly. There is no evidence impeaching them for any cause. Can the heirs, after the lapse of 18 years, be permitted to nullify their solemn deeds without cause? Deny their consent and set aside the whole transaction as a sham affair? I think not. This court will hold men bound by their solemn acts, and when it appears that a sale has been made by consent, and those consenting have received their distributive shares, will not permit them to deny their consent, hold on to the money received and recover back the property again. We cordially assert that this court will hold this sale valid, particularly as it is ratified by the subsequent acts of the heirs with a concurring knowledge of all the facts in the case.

11. The court erred in instructing the jury (No. 4,) at the instance of the plaintiff, "That if they believed from the evidence, that the sale of the slaves or the receipts of the heirs, or other papers in evidence are fraudulent, the jury will disregard them." There is not a scintilla of evidence attacking the receipts for fraud; nor is it recollected that any other papers offered in evidence were attacked for fraud. It is clearly unjust in the circuit, to tell a jury that if they find certain papers fraudulent they will disregard them, when no evidence has been offered to attack them for fraud. Such an instruction is calculated to create a suspicion of fraud in the minds of the jury, where the evidence furnishes no grounds for such suspicion; and they might be led to find fraud, because they believed that the judge thought fraud existed. The judge thus indirectly influences the jury to find a fact without evidence of it. Such instructions have often been condemned by this court.

12. The court should not have rejected the report of the settlement made by the last board of commissioners with William Keeton. The report should, at least, be held prima facie good. Had it been made a part of the record, as the preceding report, it would have been conclusive. It must have been the neglect of the clerk that it was not made a part of the record. It has the marks of fairness on its face; it respects only four receipts for money paid out by Wm. Keeton, and for which they say he is entitled to be credited, and one of these receipts makes up nearly the whole amount reported, the other three are insignificant. They are, moreover dated. But the heirs have settled by this report and thereby admitted its justice. By dividing the balance in the administrator's hands, (as shown by the report,) by the number of the heirs, it makes for each heir, within $4 00 of what Keeton actually distributed. This fact being apparent to the court, it should have let the paper in to the jury.

13. The instructions of the court are lavish on the question of fraud in the sale. We have endeavored to show, in the 10th point, that the sale was legal. We further say it was not fraudulent. It was consented to by the heirs, never objected to by them either at the sale or afterwards. There were no means used to keep down bidding or competition, and it was for a fair price: the negroes sold for $1089 more than they were appraised to in Missouri, by three disinterested men three years before. Wm. Keeton, it is true, bid off most of the negroes, but Kennerly, a witness for the plaintiff says, that Wm. Keeton said at the sale, that he was bidding for Elizabeth and the children, and the fact that he conveyed to her 18 negroes, by bill of sale, confirms this evidence. Even had he been bidding for himself, which was not the case, it is not unlawful for an administrator to purchase personal property at his own sale. I admit, he cannot buy real estate, unless he pays three-fourths of the appraised value. This point was decided in the case of Cooley vs. Rankin, 12 Mo. Rep. But we wish it understood, that we maintain the hypothesis, that Wm. K., who is proved by many witnesses to have bid off most of the slaves, said he was bidding for Elizabeth Keeton and her children, They were not, in fact his bids, but those of Elizabeth K. The jury were instructed that fraud could not be presumed, but must be proved; and although fraud may be inferred from circumstances; yet, the circumstances from which it may be inferred, must be such as necessarily and clearly tend to establish the fraud charged, and do not leave any other equally rational way to account for such circumstances. If the jury found fraud, they must have done so contrary to this intention, and therefore the court should have granted a new trial.

14. The court let in a great deal of testimony in regard to the circumstances of Wm. Keeton. The defendant asked an instruction, in effect, "that the poor circumstances of Wm. Keeton, at

Spraddling & Keeton vs. Pipkin.

the time of administering, does not furnish any evidence of fraud," which was refused. If poverty (upon the presumption that he was proved to be poor) is evidence per se, of fraud, how many men could escape the charge. This instruction should have been given. The evidence, in fact, shows that Wm. Keeton owned a tract of land for which he paid $700 00, a wagon and team, horse, saddle and bridle. Other witnesses seem only to know of his owning a horse, saddle and bridle. This does not contradict the evidence of the witnesses who knew of his owning other property. Besides, the commissioners who settled his accounts, reported allowances in his favor of $1,501 25. It will also be recollected that he had two negroes, and sent them to Missouri to mine at Valle's mine, when those mines were in their glory. How much he derived from this source we know not. It is fair to presume, that this enterprise was postponed because John Keeton had been successful there. He must have made money. Moreover, the evidence shows that he did not need the whole amount of the distributive shares to settle with the heirs in 1832, because he settled with Lackey in 1841, and gave his note for $600, which is now allowed against Keeton's administrator, and $150 00 have been paid. His circumstances were ample to do all he did, and that is sufficient. The court should have given the instruction, because it was a proper one and would have served to explain the testimony offered by plaintiff.

15. As answer to the charge of poverty, it was proved that Wm, Keeton was honest, punctual and straitforward. All defendant's witnesses give him this character, and many of plaintiff's also.

16. It is also contended, that in the fifth instruction given voluntarily by the court, it committed error. That instruction is as follows : "If the jury find that the heirs of John Keeton were at the time of Wm. Keeton's taking possession of the property were under age and married women, the limitation of the statute does not commence against them until such heirs have come of age, or the disability of marriage removed." This is good law if real estate were involved, but is not good when applied to choses in action. It is well settled, that the guardian may receive the distributive share of his ward, and give a valid receipt. The statute will run against the guardian and bind his ward. Moreover, the husband of a female becomes absolutely entitled to her choses that he reduces to possession, and from the time of reducing to possession, the statute runs against him, and the fact of his wife's being a married woman, does not make a disability. The wife has no longer title after her husband reduces her choses into possession, and the statute never runs against one who has no title. Here, then, the jury were greatly misled. They would say thus: In June, 1832, we know that Elizabeth Keeton's children were minors; that they are now married women. Here is a disability that prevents Keeton from relying on the statute of limitation or an adverse possession. The truth is, neither infancy nor marriage prevents the statute from running as to choses in action reduced to possession by guardians and husbands. In this case, when does the adverse possession commence? From the 9th April, 1832, the date of Wm. Keeton's bill of sale. If the bar commences from the date of the receipts of the heirs, it will be a little earlier as to adult heirs. The adult heirs received their destributive shares in 1831, and the guardian of the three minor heirs reports that she received their distributive shares in February, 1833. From these two dates the limitation commences. It is certainly long enough to protect Wm. Keeton's possession.

17. Two other instructions, asked by defendant, should have been given, One telling the jury to disregard the evidence of witnesses, where they speak from hearsay, rumor, report or impressions; and the other, that slight evidence is required to sustain a transaction that is old, and where it has been acquiesced in by those having an interest in setting it aside. As to the first, we remark, that there was a great deal of evidence in plaintiff's depositions founded on rumor or report, and very little on personal knowledge. The instruction was sound law, and should have been given. What effect those idle rumors had we know not. They were calculated to injure the case and the jury should have been told to disregard them. As to the other, we say that lapse of time and acquiescence is a very important element in determining the character of a transaction, A simple lapse of 30 years, dispenses with the proof of a deed; after the lapse of thirty years a court will tell a jury to presume a deed in aid of a

*possession.* A lapse of 20 years will make an adverse possession, and why should not 16 years possession, and acquiescence by those interested, make slight proof valid to sustain an old transaction? The instruction asked was good law, and it is insisted that the court erred in refusing both instructions.

18. The court should not have rejected the evidence offered by Spraddling to protect himself· individually. He offered to show an order of the county court of St Francois county, requiring him to pay one-half the hires annually to the widow of Wm. Keeton until dower assigned. He also offered his settlement with the court, showing that under the aforesaid order he had paid the widow one-half the hires of 1846 and '47, amounting to $610 64; that he had paid debts to the amount of $870 00. He further offered the book of abstracts to show that debts had been allowed against the estate (exclusive of interest, and it mostly at 10 per cent.) to the sum of $1885 17, and among the debts allowed was one to Bennett, Gibson & Lackey's note of $600 with interest. These were all exclude from the jury. The administrator was bound, by the order of the county court, to pay one-half of the hires annually to the widow. He knew that Wm. Keeton had been in the possession of the negroes sixteen years, and never doubted his title, and the court had ordered him to pay one-half the hires to the widow. Had the plaintiff wished to recover all the hires, he should have appeared in the county court. and by notice to the widow and to the administrator, gotten the order recinded. But so long as the order existed, the administrator was bound by it, and bound to act under it. In paying the widow, he acted under the order of court. Shall he suffer by it? I hope not. Again, five years possession of personal property makes it the property of· that possessor, so far as creditors are concerned; how much more would sixteen years. The administrator is trustee for the creditors as well as for the heirs; but debts must be first paid. No matter who might ultimately show title to the negroes, yet, as to creditors they belonged to Wm. Keeton, because he had got credit on them. He then was bound to pay the creditors from their hire; he could not withhold the hires from them; their title was paramount. He offered to show that he had paid debts to the amount of $870 00. It will be seen that the hires constitute means to pay debts; and yet, though Spraddling has been doing nothing but his duty, the plaintiffs try to make him shoulder these losses individually. This court will not sanction such a hardship. Show, first, that Spraddling has been to blame, and then throw the loss on him; he has done nothing but his duty. If the decision of the court below is sustained, Spraddling is ruined, and ruined too for obeying the lawful order of a court and following the law.

19. The whole is stated. Wm. Keeton had been living in Missouri since 1830, but no suit is brought for the negroes until he is dead and gone. It is true, a pretended suit was brought in Tennessee, but it was decided against them, and after the decision there, Lackey came to Missouri and settled with Keeton. Lackey was the whole head and front of the proceeding in Tennessee. They thought, that after Keeton's death, the victory would be easy, and they came here and claim the negroes.

## FRISSELL, for respondent,

Insists that the judgment should not be disturbed for the following reasons:

I. Because Wm. Keeton, as administrator of John K. has been guilty of gross fraud in the management of the estate.

1. In the first place, he caused Michael Toney to be removed and himself substituted in his place, as administrator in Jefferson county, by proving himself to be the husband of Leatha Keeton, daughter of Jno. K., when it was not the fact.

2. Up to the time of his getting letters of administration, he was a man in very moderate circumstances, but in the course of three or four years, he became the owner of some 15 or 20 slaves, while the children of Jno. K. became impoverished. He was merely able before

that time, to own a horse, saddle and bridle.    As to Wm. K.'s pecuniary circumstances, and how he became rich, and also Jno. K.'s circumstances, see depositions (cited in Mr. F.'s brief.)  What little property he (Wm. K.) had, he kept concealed from his creditors.  Spraddling appears anxious to prove a fair character and good circumstances for him, but it will be observed that he proves nothing positively; his witnesses know nothing, apparently, against him, and for that reason conclude that he stands fair.

3.  The receipt of Elizabeth Keeton bears internal evidence that it was a fraudulent contrivance, and possibly intended between her and Wm. K. for the benefit of her children to the exclusion of the older set of children.

If the contents of this receipt or bill of sale be true, then Mrs. K. paid Wm. K. the advancement he had made to the estate.  Mrs. K. was entitled in her own right and as guardian of the three younger children, to four-sevenths of the estate.  She received this, amounting to $2,344 31, and then fell in debt to Wm. K. $2,691 00, for advancements made by him to the estate, which by the recitals in the bill of sale, she paid.  These facts look exceedingly suspicious, but take them in connection with the recitals in the receipts of Wm. Gibson, H. R. Bennett and Robt. Lackey, and they are false facts, or Wm. K. paid the three younger heirs twice over : first, to their guardians, and then to their husbands.  It would seem strange, that he should do this, being a poor man, and still be able to pay cash down for at least 22 negroes.  Such things might happen in California in 1850, but such things did not happen in Tennessee in 1832.

4.  Again, when he petitioned for the sale of the negroes, the debts had all been paid but $1000, how then did his advancements to the estate swell up to $2,691.

5.  These negroes, instead of staying in Tennessee with the widow, were shortly after the sale taken to Missouri by Wm. Keeton, where they have ever since remained.

6.  The debts of Jno. K. in Tennessee, were paid, not by the sale of the negroes but by their hire, and the sale of loose property.

7.  The negroes were sold for cash, but, upon a credit, would have brought from 20 to 30 per cent. more than they did.  All but two of them, were bought by Wm. Keeton.

8.  William K. makes very extravagant charges for his services to the estate, as can be seen by reference to his statement (here referring to the record.)

9.  In support of the charges he makes against the estate, it appears that there are no vouchers on file in the proper office.  It would also appear, that for some time after the purchase of the negroes, or perhaps at times only, he represented himself as holding the negroes in trust for John Keeton's heirs.

10.  It will also be seen that Jos. H. Bradford, a security on his bond, was appointed commissioner to settle his accounts.

11.  It will also be seen how he managed in reference to paying the heirs by examining the deposition of William B. Gibson.

12.  The receipt of Lackey was also produced, but by the testimony of John Scott, none of his share was paid until quite necessary, and now only $150 have been paid.

From all the circumstances above detailed, it would seem that gross fraud had been practiced by Wm. K., and if the signature of Elizabeth K., to the bill of sale, was really genuine, she, perhaps, was implicated, though receiving no benefit.  The great bulk of the estate of John K., came into the hands of William K., where it remained till his death.

The verdict of the jury from the same county where William K. had resided for many years, and who had known him well, was predicated upon the fraud.  This was really the gist of the whole matter.  The Tennessee statute, declaring the sale void, was introduced merely for the purpose of preventing the defendant below from seeking protection from what might technically be called a title.

II.  With this view of the case, the question of domicil and the consequences flowing from it become immaterial.  Whether the slaves pertained exclusively to the Missouri administration or to the Tennessee administration, or might properly have belonged to either, or whether

they were in K.'s hands as trustee for the heirs and creditors of John K., becomes a matter of no importance. The slaves still belong to the estate of John Keeton.

No one ought to have complained of William K.—no one would have complained of him if he had held the slaves for the distributees and not for himself, no matter whether as administrator or trustee. All were satisfied until he took the negroes to Missouri.

William Willhite states, in his deposition, that Margaret Keeton (wife of William Gibson) received two negroes, Harvey and Minerva. He also states that he never got Harvey at all, and that he got Minerva from his mother-in-law and not from William K. Both these were their own witnesses. Willhite, who is more relied on than any other witness by the appellant, upon his cross-examination, shows that he derived most of his information from William Keeton. In his examination in chief, he states this information as of his own knowledge, but upon his cross-examination he discloses the source whence he derived his information. He is the son of a deceased sister of William K., and so stated in his deposition, before testifying in chief. He is an heir of Wm. K. He states, positively, that Gibson got Harvey: this was a mistake. He says, also, that G. got Minerva: he did get her from his wife's mother. As to the other heirs and the slaves they received, there is no testimony to contradict his statements, but he admits he did not see them delivered, but he saw Harvey at G.'s house, but it so happened that he was, at that time, in the possession of William K. We, however, derive one important fact from him, and that is the statement of William K. that John K.'s debts were paid by the hire of the negroes and the sale of the loose property belonging to the estate.

The circumstances surrounding the heirs must also be considered in reference to the acts of William K. in this matter. There were nine children, and all but one, females. One of the elder daughters was the wife of Robert K., brother of William K. George K. had no interest; he had received land from his father, as his portion, to enable him to get an education He also died in 1833 or 4. Lethea, the third of the three eldest of the children, was married to Alfred White, and was very poor, as may be seen from the letter from William K. to Robert K., given in evidence. Under these circumstances, was it reasonable to suppose that suit would have been brought earlier than it was, in Tennessee. In this suit they were defeated, not upon the merits, but upon the ground that William K.'s securities there ought not to account for the negroes that came into the hands of K. in Missouri. If the testimony in that case is looked into, in the case of Pipkin vs. Casey, it will be seen that downright swindling if not stealing, is proved against William K., in reference to the estate. The heirs were disheartened and impoverished by the result of the suit in Tennesse, but being conscious of their rights, as soon as arrangements could be made, they commenced suit in Missouri, and having recovered in the court below, by a satisfactory verdict rendered by the neighbors of William K., they are dragged into this court.

Their receipts to William K. are urged against them. They could not even have gotten William K.'s promise to pay them any thing, without such receipts as he thought proper to write for them. It is in evidence that he got both Gibson and Lackey's receipt without paying them the money, and Lackey is not yet paid. How he managed with Alfred White and the others there is no evidence. He got Mrs. White's interest, in part, or all her father's land, and how much, or where or how he paid her is left to conjecture, but he has her husband's receipts as well as Lackey's.

Fault is found, because the public administrator of Jefferson county brings suit and not the heirs. John K. died in Jefferson county and there was the original administration. There are, also, two suits now pending in Jefferson couuty for slaves belonging to the estate. It is thought that it would have been wrong to have taken out letters in any other county than Jefferson under the circumstances. The county court of that county has taken jurisdiction of the matter, under the law of 1825. No other court could rightfully take the matter from that court.

It is, perhaps, true, that the heirs might have brought suit in their own name, without the interposition of an administrator. It is pretended that the property has been administered

Spraddling & Keeton vs. Pipkin.

upon, or that it has been disposed of by any person as administrator; then, surely, the administrator can sue.

Objections are also made to the declaration, as being bad   We had our choice, to bring the suit against Wm. Spraddling and Hannah M. Keeton, as administrators or as individuals. We chose the course which we believed would be least injurious to them, for by suing them as administrators, we precluded ourselves from getting damages or property not in their hands as administrators, and the costs would have to come out of the estate.   The commencement of the suit gave notice of our claim, and damages were only claimed or given from that time. If the administrator has let the hire of the negroes, accruing since the suit was commenced, get out of his hands, he is clearly responsible in his private capacity.   He might as well sell the negroes and pay out the money as let the hire get out of his hands.   It is believed, whether the declaration is according to the old forms of Chitty, or not, that it was sufficient to give the defendant precise notice of the nature and extent of the claim of the plaintiff.

Upon the whole matter, then, it is submitted to the court, that the verdict is for the right party, and that it ought to stand, and that the judgment should, in all things, be affirmed,

GAMBLE, J., delivered the opinion of the court.

This is an action of detinue, brought by Pipkin, public administrator of Jefferson county, having charge of the estate of John Keeton deceased, against Spraddling & Keeton, as administrators of the estate of William Keeton, to recover several slaves.

It appears that John Keeton, a citizen of Tennessee, resident in Franklin county, came to the State of Missouri, in 1825, bringing with him some eighteen or twenty slaves, some of whom he employed in mining for lead and others he hired out.   When he came to this State he left, at his residence in Tennessee, his wife and six children, who had, in their possession, his farm and his household effects.   At the time he left Tennessee he was much embarrassed, and as his mining operations in Jefferson county in this State became profitable, he returned once or twice to Tennessee, with money for the purpose of paying his debts.   He died in Jefferson county in the fall of 1826, his family still living on his farm in Tennessee.   Administration was granted by the probate court of Jefferson county to one Taney, and subsequently the letters were revoked, and administration *de bonis non* was granted on the 15th March 1827 to William Keeton.   The administrator, Keeton, filed an inventory, which embraced the slaves left by the intestate. Before William Keeton obtained the letters *de bonis non*, he had been appointed administrator of John Keeton's estate in Tennessee.   In September 1827 the administrator made a settlement of his accounts in the probate court of Jefferson county, and on the 3d of November 1830, he made his final settlement; upon which it appeared, that after paying all demands, there remained a balance in his hands amounting to $57 62. The record of that court, as given in evidence in this case, does not

show any order of distribution or other order, making a disposition of the slaves. It appears that after William Keeton had become the administrator, both in Tennessee and Missouri, and before his final settlement here, he removed the slaves to Tennessee in the year 1827 or '28, and that he hired them out there for some two years, and accounted to the proper court for the hire, as a part of the assets of the estate. The balance which appeared against him, on his final settlement here, was also carried into his account of the administration in Tennessee and settled there. An order was obtained upon the petition of the administrator to the court of pleas and quarter sessions of the county of Franklin, Tennessee, for the sale of the slaves, for the purpose of paying debts and making distribution. Under this order, a sale was made on the 5th of March 1830, and not long afterwards, the administrator was in the possession of most of the slaves, claiming them as owner. He made a bill of sale in 1832, purporting to convey eighteen of the slaves to Elizabete Keeton, widow of his intestate, as slaves which she had purchased at the sale made in 1830 by him as administrator; and, upon the same day, she executed another bill of sale by which she conveyed to him ten of the same slaves. It is admitted, by all parties, that the court of pleas and quarter sessions, in making the order for the sale of the slaves, acted without any jurisdiction in the matter, and that the order is utterly void. It appeared that William Keeton made report of the sale to the court which ordered it, and that a general settlement of his administration took place in that court, upon which the amount payable to each of the distributees was ascertained. Receipts were produced upon the trial, given by several of the distributees to the administrator, for their distributive shares, as ascertained upon the settlement in the court of pleas and quarter sessions.

There is, upon the record in this case, a great mass of evidence which was used at the trial, to show that the sale of the slaves made by the administrator in Tennessee, was fraudulent, and that the receipts procured from the distributees were obtained by fraud. The whole of this evidence, is, in the view of the case entertained by this court, entirely irrelevant to the questions upon which the cause must be determined. It may therefore be dismissed, with the single remark, that if the question of fraud, in the administrator's sale, were that upon which the case depended, we think the evidence would well warrant the conclusion that fraud existed.

It appeared on the trial, that Pipkin, the public administrator of Jefferson county, was ordered by the county court of that county, on the 5th of August, 1847, "to take charge of and administer the goods and

chattels, property and effects of the estate of John Keeton, deceased, unadministered by the former administrators of said estate." As William Keeton had removed to this State, and brought with him the slaves which he claimed under Elizabeth Keeton (the alleged purchaser at the sale made by him as administrator,) this suit was brought to recover the slaves which had at that time, been sold, and which were afterwards held by him, and also to recover such as were offsprings of the slaves thus held.

At the trial, Pipkin, after showing the order of the county court, requiring him to take charge of the property and effects of John Keeton, remaining unadministered , proved that the slaves, sued for in this action, were the same which were described in the inventory filed by William Keeton as former administrator of the estate in the probate court of Jefferson county, or, were the offspring of such slaves, and that at the commencement of the suit, they were in the possession of the defendants, who claimed them as the administrator of Wm. Keeton. As this was regarded as making a *prima facie* case for the plaintiff, the defendants showed the settlement of William Keeton, the former administrator upon the estate of John Keeton, and the fact that he was administrator also in Tennessee; that he had removed the slaves to Tennessee, and had carried, into his administration there, the balance which was found against him here, and also the hire of the slaves. The existence of debts in Tennessee, was also showed. The record evidence also showed the order of sale made in Tennessee, and the settlements made by the administrator in the court of Franklin county, into which was carried the amount produced by the sale of the slaves. This is all that is necessary to extract from the voluminous record, to show the points upon which the case depends.

After the evidence was closed, the court at the instance of the plaintiff, gave the following instructions:

1. That if the jury find from the evidence, that the slaves in question came into the hands of William Keeton by virtue of his letters of administration on the estate of John Keeton, and that they have not been legally administered upon by William Keeton in his life time, the title in said slaves vested in William Pipkin, public administrator of Jefferson county, by virtue of the order of the county court of that county, giving said estate into his charge, and they must find for the plaintiff.

2. If they find for the plaintiff, they will find the value of each slave separately, and the value of their services from the commencement of the suit to the present time.

3. That the receipts of the heirs, in evidence, are not even *prima*

*facie* evidence of a sale of the slaves to William Keeton and could not operate to divest them of title, or to confer title upon William Keeton.

4. That if the jury believe from the evidence, that the sale of the slaves or the receipts of the heirs, or other papers in evidence are fraudulent, the jury will disregard them.

5. That there is no evidence before the jury that the slaves have been administered upon, and the title of John Keeton's heirs divested, under the letters granted in Jefferson county.

The court, also, at the request of the defendant, gave the following instructions:

1. That if the jury believe that William Keeton was the administrator on the estate of Jno. Keeton, both in Missouri and in Tennessee, that then, on the final closing of the administration, in the State of Missouri, he had the right to carry, remit and transfer to the State of Tennessee, which was the domicil of the said John Keeton, deceased, the rest, residue and remainder of the property to be paid out, disposed of and administered upon, according to the laws of the State of Tennessee.

2 That after administration, duly granted and the taking possession of the property by the administrator, the property thus taken possession of becomes the absolute property of said administrator, so far as the title is concerned, and he may dispose thereof, as his own, and make a good title of the same to the purchaser, unless the laws of Tennessee prescribe a different course.

3. That fraud must be proved and cannot be presumed; and although fraud may be inferred from circumstances, yet the circumstances from which the fraud may be inferred, must be such as necessarily and clearly tend to establish the fraud charged, and do not leave any other equally natural way to account for such circumstances.

4. That if the jury shall find from the evidence, that William Keeton purchased out, or that he owned any part of said slaves, and held or holds an undivided interest therein, in common with the heirs of John Keeton, then the plaintiff cannot recover in this action only to the extent of his interest.

5. That the record from the county of Jefferson, Missouri, given in evidence in this case, is *prima facie* evidence that the affairs of said estate were finally settled and closed in Missouri before the slaves were sent or taken to Tennessee.

6. That the accounts of expenses, payments and disbursements, rendered by William Keeton, as administrator of John Keeton, and which were rendered to the court of pleas and quarter sessions in Tennessee, and were passed upon and allowed by the commissioners appointed by

9

Spraddling & Keeton vs. Pipkin.

the court, and approved by the court, are not now the subject matter of adjudication, nor can they now be revised and reviewed by the jury on this trial.

The following instructions were also asked for the defendant and refused :

1. That if the jury believe that William Keeton made a final settlement of his administration on the estate of John Keeton, in the county of Jefferson, State of Missouri, by paying all the debts and liabilities of said estate, and that afterwards, the rest and residue of the property and slaves of the estate of John Keeton was taken, carried, transmitted and remitted to Tennessee, and placed in the hands of the administrator, then they must find for the defendant.

2. That if the jury believe that William Keeton, the administrator, on reaching Tennessee with the property of the estate of John Keeton, deceased, then and there administered; the property and slaves of said estate according to the laws of Tennessee, by hiring out the slaves and accounting for such hire, paid the debts due by the estate of John Keeton, and made due and proper settlements of his said administration, and paid over to the widow and distributees their and each of their respective parts thereof, then they are bound to find for the defendant.

3. That where the intestate stands indebted to the administrator, then the administrator may take the property of the intestate in payment and discharge of the debt thus due him.

4. That an administrator, having appropriated the property of the intestate to the payment of the debt due himself, may, if he is sued therefor, defend himself in any action brought against him therefor.

5. That the jury will disregard all the statements of the witnesses in the several depositions, wherein the witness speak from hearsay, rumor, report, belief, understanding or impression, and attend only to the statements made from actual knowledge of the witnesses.

6. That the fact of poverty, or the poor circumstances of William Keeton at the time of his administering on said estate, either in Missouri or in Tennessee, he having given unimpeached security in both States, does not furnish any evidence of fraud, nor ought the jury from the mere proof of the embarrassed condition of the said William Keeton, to infer that he acted fraudulently.

7. That the uninterrupted and peaceable possession by Wm. Keeton, of the slaves in question for such a length of time, more than five years, with the knowledge of the distributees of the estate of John Keeton, deceased, amounts to an adverse possession, and will protect the estate

Spraddling & Keeton vs. Pipkin.

of said William Keeton and this defendant, in the possession of the property.

8. That the acquiescence of the widow and heirs of John Keeton, in all the actings and doings of William Keeton, in regard to the administration, and their receiving and receipting to the said William Keeton for their respective distributive shares of said estate, after the payment of all debts, amounts to a ratification and approval of the acts of said administrator, and furnishes a strong presumption that they were satisfied with his previous acts, unless such sale is void under the laws of Tennessee.

9. Unless the jury shall find from the evidence, that the exclusive right to the slaves in suit belongs to the plaintiff, they must find for the defendant.

10. Unless the jury shall find from the evidence that the right to the exclusive and immediate possession of the slaves in controversy, belonging to the plaintiff, they must find for the defendant.

11. That the right to the slaves in controversy is a legal right, and to be determined on legal principles, and not equitable rights.

12. That the proceedings in regard to the administration in the State of Tennessee and the record thereof given in evidence, in this case, is prima facie evidence of the due and proper administration and settlement of said estate of John Keeton in said State of Tennessee.

13. That slight evidence is required to sustain a transaction which is old, and particularly if it has been long acquiesced in by those having an interest in setting it aside, and every presumption is in favor of such acts.

14. That even should the order of sale, made by the court of pleas and quarter sessions, to sell the negroes, be considered irregular, yet, if the jury shall believe that such order was made by the consent of the adult heirs and distributees, and that the sale made in pursuance of such order, has been acquiesced in, and all the heirs have received their distributive shares of said estate and negroes, and executed their receipts in full and with a full knowledge of all the facts, such acts amount to a ratification of the order and sale, and they must find for the defendant.

15. That if the jury should believe that William Keeton did purchase some of the negroes of said estate, yet, if they are satisfied that the sale was open and public, and that the negroes were sold for a fair price, and that no means were used to cover or keep down competition in bidding, by said Keeton, then such purchase by said Keeton was not fraudulent nor any evidence of fraud.

The court, of its own motion gave the following instructions:

1. If the jury find, that the slaves in controversy were sold under an order of the court of pleas and quarter sessions of the county of Franklin and State of Tennessee, then such sale is wholly void, and conferred no title to the purchaser, and no acquiescence or receiving the distributive shares of the proceeds, by the heirs, can avail to make such sale valid and binding upon them.

2. If the jury find that William Keeton purchased the slaves and held possession of them for the heirs, such possession is not adverse, and no length of such possession can affect their right of property or bar their right of recovery.

3. If the jury find that the title to the slaves in controvery never legally passed to William Keeton, in his own right, his possession of them is presumed to be in support of the rights of those legally entitled, and it devolves upon the defendant to prove it adverse, in order to enable them to protect their rights under such possession.

4. But if the jury find that Keeton purchased the slaves for himself, paying the heirs their equal shares of the purchase money, and held the possession of them, as his own property, and not as administrator of John Keeton, then such possession is adverse, and, after the lapse of five years, is an effectual bar to the plaintiff's right of recovery, although such sale was wholly void, and of itself conferred no title.

5. If the jury find that the heirs of John Keeton, were, at the time of William Keeton's taking possession of the property in controversy, under age, and were married women, then the limitation of the State does not commence against them until such heirs have come of age, or the disability of marriage removed.

From the numerous instructions thus thrown before the jury, it is exceedingly difficult to ascertain the views of the court upon the law governing the case.

The first instruction given for the plaintiff, informs the jury, that if the slaves in question, came into the hands of William Keeton, as administrator, and they have not been legally administered upon by him, then the title vested in the plaintiff, by virtue of the order of the county court of Jefferson county, and they must find a verdict for the plaintiff. The fifth instruction, given for the plaintiff, informs the jury that there is no evidence before them that the slaves have been administered upon, and the estate of John Keeton divested under the letters granted in Jefferson county. In the first instruction given for the defendant, the court declared the law to be, that if William Keeton was administrator, both in Missouri and in Tennessee, then, on the final closing of

the administration in the State of Missouri, he had the right to take to the State of Tennessee, which was the State of the domicil of John Keeton, the remainder of the property to be administered upon, according to the laws of Tennessee; and in the fifth instruction, given for the defendant. the jury are told that the record from the county court of Jefferson county, is *prima facie* evidence, that the affairs of said estate, were finally settled and closed in Missouri, before the slaves were taken to Tennessee.

If, on the closing of the administration, in Missouri, the administrator was authorized to take slaves to Tennessee, and carry them into his administration there, and if they were taken to Tennessee under that authority, and administered upon there, it is difficult to find any good reason for saying that they have not been fully administered upon under the letters of administration in Missouri. In such a state of facts, the administrator in Tennessee would be invested with all the title to, and power over the slaves, which, by the laws of that State, would belong to an administrator on the slaves that had never been out of the State, and his responsiblity would be the same in relation to slaves thus received from abroad, as if they had been on the farm of the intestate, in Tennessee, at the time of his death. If the right of the administrator in Missouri, to transfer the slaves to the administrator in Tennessee, is once conceded, it will follow, as a natural and necessary consequence, that the transfer, when made, is a legal administration of the slaves, which cannot afterwards be questioned by the administrator de bonis non.

It is a settled rule of law, not requiring, at this day the citation of authorities to maintain it, that the administration of all the goods of an intestate, wherever situated or found, is to be made according to the law of the land of the testator's domicil. When they are in a different country, they are first applied under the laws of that country to the satisfaction of the claims of creditors who establish their claim under its laws, and if there are any of its citizens who claim as distributees, distribution of the assets will be made there. But, after the cliams of creditors are satisfied, and when the distributees reside in the country of the testator's domicil, or there are other creditors there whose claims remain unsatisfied, the tribunals of the country, in which the assets are found, will direct them to be remitted to the country of the domicil, for further administration. This rule of comity is acknowledged and enforced by the courts having the control of the assets, not as a rule absolutely obligatory upon them, but as a rule to be enforced, when, in their judgment, the interests of all concerned in the estate

will be advanced by the transfer.   Our legislature have given to this rule, heretofore existing in our unwritten law, the form and force of a statutory enactment; which while it retains for our courts the discretion necessary to be exercised in such cases, manifests a proper regard for the interests and convenience of the citizens of other States—Rev. Code 102.

In determining whether assets of a deceased person shall be transferred from the State, the first thing to be ascertained is, where did the intestate have his domicil?   In whatever State that may have been, the administration granted there is the principal administration, and that, in any other State is auxiliary.   Priority in the administration, has no effect upon this question.   Mr. Justice Jackson, in delivering the opinion of the court in Steven's adm'r vs. Gaylor, 11 Mass. Rep. 263, properly declares the law in this language: "It is true, that such auxiliary administration is not usually granted until an administrator is appointed in the place of the deceased's domicil.   But this cannot·be necessary prerequisite, for if so, and it should happen that administration is never granted in the foreign State, the debts due here, under such circumstances, to a deceased person, could never be collected; and the debts due from him to citizens of this State might remain unpaid.   The time of granting the respective letters of administration is also immaterial in this case.   The administrators in Connecticut, if duly appointed, must, collect all the effects of the deceased in that State; whilst the plaintiff will do the like here; and the residue, after paying the debts of the deceased, wherever collected or remaining; must be distributed according to the laws of the State in which the deceased dwelt.   If it should appear, upon due examination in our probate court, that Tibbats had his home in Connecticut, we should cause the balance remaining in the hands of the administrator here, to be distributed according to the laws of Connecticut, or transmitted for distribution·by the administrator in Connecticut under the decree of the probate court there."

Without regard then, to the date of the several letters of administration, granted in this case, if it be true, that the domicil of John Keeton was in Tennessee, the effects remaining in the hands of the administrator here, after all debts allowed against the estate, in the probate court of Jefferson county were paid, would have been distributed here, or ordered to be transmitted to Tennessee for further administration there, as our courts would have judged most reasonable and proper. In the exercise of this discretion, the condition of the estate in the hands of the principal administrator, the existence of debts in Tennessee unsatisfied, and the evidence of the distributees in that State would

have had a controlling influence. We have no doubt, that upon an application to our courts, under the facts apparent in this case the slaves in question would have been ordered to be delivered over to the administrator in Tennessee. But the administrator in both States was the same person, and would have been the proper applicant for such an order of transfer, while at the same time, he would have been the person to resist the application. No such application appears to have been made, and no such order is shown. The transfer was, in fact, made, and the slaves were taken into the Tennessee administration, and their hire and price accounted for, there; and now the question is presented, whether this act of the administrator in Missouri, can be regarded as a legal disposition of the property finally closing up his administration. It is evident, that this question is, in no degree, affected by the subsequent frauds alleged to have been perpetrated by the administrator in Tennessee, in selling the slaves under the order of a court having no jurisdiction, and being, himself, interested in the purchase. If the transfer of the slaves was an act within the legal competence of the administrator here, it had the effect of giving the title to the administrator in Tennessee, and was such an administration of the property that it cannot now be questioned by the administrator *de bonis non*, in this action of detinue.

It is the opinion of the court, that this record shows a case in which the transfer would have been ordered, and inasmuch as the administrator in Missouri, more than twenty years since, did only what the court, under the circumstances, would have ordered him to do, his act, in making the transfer, completed the administration here upon the slaves, and gave the title to them to the administrator in Tennessee; so that an administrator *de bonis non*, appointed as the plaintiff is, cannot claim them as the property of John Keeton unadministered by the former administrator in Jefferson county. The plaintiff, under his appointment and the order of the county court, is the successor of the administrators appointed by that court, and not of the administrator in Tennessee.

If it be said, that the administrator in Tennessee converted the slaves there to his own use, and then brought them to this State, and that this administration is necessary to enforce the claims of this distributee, it may be answered, that such converting gave to the distributees, at once, a right to proceed against the administrator in the courts of that State, and when he removed to this State, our courts of equity were open to them, in which to assert their rights and to claim that, notwithstanding the sale made in Tennessee, he was still a trustee for them. There exists no necessity for holding the plaintiff, acting under the order of the

county court of Jefferson county, to be the proper party to enforce the rights of the distributees. Their remedy is still open and plain before them. A court of equity is competent to declare that William Keeton was, after the sale, as before, a trustee for them, if it be made to appear, either that there was fraud in the sale, or that he was the purchaser at a sale made by himself as administrator. In such a proceeding the court can give proper weight to all the transactions between the administrator and the distributees, subsequent to the sale, and can take into consideration the acts of alleged ratification of the sale and the circumstances under which receipts and acknowledgments were obtained, and, in short, can adjust the controversy upon the principles which apply to questions between trustee and *cestui que trust.*

It is obvious, that if a direct action of detinue be authorized in such a case as the present, all the transactions between the distributees and the administrator must be rejected from the consideration of the court; for the reason, that the plaintiff, if he could recover at all, must recover by a title, prior in time to the title of a distributee, and, of course, unaffected in law by the acts of the distributees, if they had all acted with the fullest knowledge, and were even at the trial willing to abide by their acts. We think, therefore, that in relation to the alleged conversion in Tennessee by the administrator there, the proper method of reaching the merits of the case, is by a bill in equity, stating the character of the sale, and the fact of the administrator's being the purchaser, or in collusion with the purchaser, and showing such facts as according to the principles of equity would continue his character of trustee, notwithstanding his pretended purchase.

After stating the principles which we think applicable to the case, it is not necessary to examine the instructions in detail. It is evident that the circuit court entertained the opinion that the plaintiff, acting under an order of the county court of Jefferson county, was entitled to dispute the regularity and legality of the administration in Tennessee, and to recover, in this action, any slaves of John Keeton's estate which had not been legally administered according to the laws of Tennessee. It may be useful to state the questions of fact upon which we think the suit must be decided.

1. Was the domicil of John Keeton, at the time of his death, in the State of Tennessee?

2. Was the administration upon his estate in Jefferson county, in this State, finally closed by the payment of all the debts exhibited against the administration?

---

3. Did the administrator in this State take the slaves to Tennessee and carry them and their hire into the administration there?

If all these questions are answered in the affirmative the plaintiff cannot claim the slaves as any part of the property left unadministered by his predecessors.

The judgment of the circuit court is, with the concurrence of the other judges, reversed, and the cause remanded to be proceeded in according to this opinion.